## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-CR-00207-KOB-HNJ |
| | ) | |
| DERRICK GLENN JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the court on Defendant's "Renewal of Defendant's Fed. R. Crim. P. 29 Motion for Judgment of Acquittal," (doc. 166), and "Motion for New Trial," (doc. 167). Defendant Derrick Glenn Johnson was tried by jury from October 22 through October 24, 2018. At the close of the Government's evidence, but prior to the case being submitted to the jury, Mr. Johnson orally moved for a judgment of acquittal. The court reserved judgment on the motion.

On October 24, 2018, the jury trial found that Mr. Johnson was guilty as to Count 1 of the Indictment, charging conspiracy to possesses with intent to distribute cocaine hydrochloride weighing 10 kilograms or more. (Doc. 163). The jury was unable to return a verdict on Count 2 of the Indictment, charging possession with intent to distribute cocaine hydrochloride weighing 10 kilograms or more.

On November 12, 2018, Mr. Johnson filed his "Renewal of Defendant's Fed. R. Crim. P. 29 Motion for Judgment of Acquittal." (Doc. 166). Mr. Johnson contends that "there is a fatal variance between the allegations of the indictment and the proof offered by the Government or

the Government failed to present sufficient evidence" upon which the jury could convict Mr. Johnson of either count. (*Id.*).

Mr. Johnson also filed his "Motion for New Trial" that same day. (Doc. 167). The motion for new trial raises four grounds for new trial: (1) the court "committed prejudicial error in failing to rule on Mr. Johnson's Motion for Judgment of Acquittal made at the close of the Government's case"; (2) the court "committed prejudicial error in failing to rule on Defendant's Motion for Judgment of Acquittal at the close of all the evidence"; (3) "[t]he verdict is contrary to the weight of the evidence"; and (4) "Defendant has learned that at least one juror knew the Defendant but did not disclose that to the court during voir dire." (*Id.* at 1).

On November 28, 2018, the prosecution filed "United States' response to Defendant's Motion for Judgment of Acquittal." (Doc. 171). That same day, the prosecution also filed "United States' Response to Defendant's Motion for New Trial." (Doc. 172). The motion for new trial and motion for judgment of acquittal are now ripe for review.

**I. Background**

The Government's and Mr. Johnson's accounts of the events of March 26, 2015, the date of Mr. Johnson's arrest, differ in several important respects. The court will recount both versions of the events.

**a. Government's account**

On March 26, 2015, Ms. Alondra Melgar was driving a silver Mercedes SUV containing drugs from Houston, Texas to Birmingham, Alabama. (Doc. 177 at 121, 124–25). While Ms. Melgar was driving on I-59 near Eutaw, Alabama, Alabama Law Enforcement Agency Trooper Mike Harris pulled over her vehicle at 3:00 pm. (Doc. 178 at 8).

Trooper Harris testified that he pulled over Ms. Melgar's vehicle because he noticed the vehicle had a temporary tag, which, through his training and experience as a law enforcement officer with specialized training in the Drug Interdiction Assistance Program, sometimes indicates the vehicle may be stolen. (Doc. 178 at 8–9). When Trooper Harris approached Ms. Meglar, he became suspicious that she was transporting narcotics. Ms. Melgar consented to a vehicle search. (Doc. 177 at 136). Trooper Harris moved Ms. Melgar to the patrol vehicle before searching the SUV. (Doc. 178 at 13).

When Trooper Harris began the search, he testified that he noticed that the front seat belts had recently been tooled, "an indicator . . . that the vehicle had some aftermarket work done to it, something other than what the factory did back in 2007." (Doc. 178 at 13). He also smelled a strong scent of Bondo, a product used in mechanic shops when doing body work. (*Id.* at 14). According to Trooper Harris, Bondo is not smelled after professional use, because professionals bake Bondo on to remove the smell, but can be smelled when used by nonprofessionals. (*Id.*). He described Bondo smelling simply "like Bondo"—a distinctive scent. (*Id.* at 49). Trooper Harris pulled the carpet back by the front passenger's door and noticed an aftermarket compartment was constructed in the vehicle. (*Id.* at 14).

Trooper Harris retrieved a drill from his patrol car to access the compartment. (Doc. 178 at 14). He used a fiber optic scope and saw nothing in the passenger side compartment. (*Id.* at 14–15). Trooper Harris noticed a similar compartment on the driver's side, which bore the same signs of aftermarket work: tooled seat belts and an aftermarket compartment under the carpet. (*Id.* at 15). When drilling the driver's side compartment, Trooper Harris noticed a white powdery substance, which later tested positive for cocaine. (*Id.* at 16).

Trooper Harris returned to the patrol car, arrested Ms. Melgar, and read her *Miranda* warnings. (Doc. 178 at 16). About 10 to 20 minutes after returning to the patrol car, Ms. Melgar began to open up about the SUV. She told Trooper Harris that she was driving the car for someone else to Birmingham, where she was to pick a hotel to drop off the car, and a gentleman would pick up the car. (*Id.*).

Trooper Harris then contacted the Drug Enforcement Agency. DEA agent Russell Morrison instructed Trooper Harris to come to the DEA office. (Doc. 178 at 18). Trooper Harris noted the operation was "time sensitive because of the trust between the seller and the receiver." (*Id.*). Another law enforcement trooper followed Trooper Harris and Ms. Melgar to the DEA office driving the Mercedes SUV. (*Id.*).

During this time, Ms. Melgar received phone calls from Pete and Blue, the two men for whom she drove the car, which she did not answer because Trooper Harris had her phone. (Doc. 177 at 139). To prevent Pete and Blue from becoming suspicious, Trooper Harris told Ms. Melgar to answer the next call. (*Id.*). Ms. Melgar answered Pete's next call and explained that she had stopped at a gas station because she felt sick. (*Id.*). Pete told her to get what she needed and to take her time. (*Id.*).

At the DEA office, Trooper Harris again accessed the aftermarket compartment on the driver's side. Trooper Harris removed the seats from the vehicle by undoing four bolts with a socket and ratchet and pulling the carpet back. (Doc. 178 at 19). Trooper Harris testified that it took him approximately five minutes to access the compartment, now that he knew where it was. (*Id.* at 28). In the compartment, Trooper Harris found 14 bundles of cocaine. (*Id.* at 19). The 14 bundles equated to 14 kilograms of cocaine. (*Id.* at 74). In 2015, cocaine was sold for between

$1,200 and $1,500 per ounce. (*Id.* at 88). One kilogram of cocaine would fetch $55,250 if sold in ounces. (*Id.*).

This trip was not Ms. Melgar's first time transporting cocaine. Ms. Melgar also drove the Mercedes SUV and a load of cocaine to Birmingham the week prior to getting arrested. She testified that she agreed to drive the Mercedes SUV carrying drugs from Houston to Birmingham in January 2015. (Doc. 177 at 123–24). Ms. Melgar's hairdresser put her in contact with a man named Pete in Houston, who organized for Ms. Melgar to drive the SUV full of cocaine so she could make some extra money. (*Id.*). Pete informed Ms. Melgar that she would be working with another man, Blue. (*Id.* at 125). Ms. Melgar described Blue as a middle-aged "tall, white, Caucasian" man with a "military hair cut." (*Id.*).

Ms. Melgar first drove the Mercedes SUV from Houston to Birmingham on March 19 or 20. (Doc. 177 at 126). The whole trip, she was closely followed by a silver Cadillac, driven by a male with a female passenger. (*Id.* at 126, 128). Ms. Melgar identified the male as Blue. (*Id.* at 128). Pete told Ms. Melgar that they needed to ensure she was trustworthy. (*Id.* at 124). In December, Pete and Blue lost a large amount of cocaine between Houston and Birmingham. (Doc. 178 at 124–25). Pete called Ms. Melgar continuously throughout the trip, telling her if she was going too fast and where to pull over. (Doc. 177 at 125). Blue also called Ms. Melgar, asking if she needed rest, gas, or something to drink (*Id.* at 128). Blue and Pete told Ms. Melgar to select a hotel near Birmingham and to let them know which one she chose. (*Id.* at 130). At the end of the trip, Ms. Melgar selected a hotel as instructed, left the key in the bottom of the mat, and went into her hotel room. (*Id.* at 129).

That night, Ms. Melgar saw the man who had driven the Cadillac pick up the SUV. (Doc. 177 at 130). The man returned the car around midnight. (*Id.*). Around 5:00 am, she drove back to

Houston. (*Id.* at 131). In Houston, Pete and his wife picked up the SUV from Ms. Melgar's house. (*Id.*) She was paid after the money she drove back to Houston was counted. (*Id.*).

Using the information Ms. Melgar shared with the DEA regarding how the drop-off process worked, DEA Agent Sean Stephen, whom Trooper Harris contacted, decided to complete Ms. Melgar's delivery. (Doc. 178 at 72–73). Agent Stephen hoped that completing the delivery would lead the DEA to more people connected with this drug trade. (*Id.* at 73). But, to avoid potentially losing all 14 kilograms of cocaine if the agents' plan failed, the agents removed all but two ounces of cocaine from the SUV. (*Id.* at 73–74).

The DEA picked the Fultondale LaQuinta Hotel—a different hotel from the one Ms. Melgar selected for her first trip—for Ms. Melgar to complete the drop-off. (Doc. 177 at 139–40; Doc. 178 at 75). Ms. Melgar testified that she called Blue a little after 6:00 pm, during which she explained her delay due to being sick and traffic from President Obama's visit to Alabama, and that the car was at the Fultondale LaQuinta. (Doc. 177 at 140–41). Agent Stephen testified that Ms. Melgar made calls to Pete and Blue at 6:15 pm and 6:37 pm. (Doc. 178 at 75). During the 6:37 call with Blue, Ms. Melgar identified the hotel where she would leave the car. (*Id.*). Ms. Melgar dropped the car off, while DEA agents in two undercover cars parked around the back of the hotel at approximately 7:00 pm. (Doc. 177 at 141; Doc. 178 at 76). Ms. Melgar walked in through the front of the hotel, like she was checking into a room, and then exited out the back into the custody of DEA. (Doc. 177 at 141).

At 8:40 pm, a green pickup truck with two individuals pulled up by the Mercedes SUV. (Doc. 178 at 77). The passenger exited the truck and got into the Mercedes SUV. (*Id.*). The Mercedes drove away with the green truck following. (*Id.*). The vehicles exited the hotel and merged onto I-65 south. (*Id.*). The DEA's two undercover cars followed at a distance. (*Id.*). The

SUV and pickup truck stayed together heading south on I-20/59. (*Id.*). Around Fairfield and

Bessemer, the green truck exited at Exit 115, while the Mercedes SUV continued until the 18th

or 19th Street exit by the Lowe's in Bessemer. (*Id.*). When the truck and SUV split up, the DEA

agents only followed the SUV. (*Id.* at 77–78).

After exiting the highway, the Mercedes SUV drove to Trail's End Deer Processing Plant

in Bessemer, arriving at approximately 9:00 pm. (Doc. 178 at 78). Trail's End is a small

warehouse building with a roll-up garage door to the right of the entry door. (*Id.*). Both doors are

on the front of the building. (*Id.*). When the Mercedes SUV arrived, Mr. Johnson got out of the

vehicle and entered the building through the normal door. (*Id.* at 102). The roll-up door went up,

Mr. Johnson got back in the Mercedes SUV, and he drove the SUV into the garage bay. (*Id.* at

102). Once inside, the roll-up door closed. (*Id.*). Several minutes later, the green pickup truck

arrive, and the driver entered the building through the front door. (*Id.* at 79).

The law enforcement agents drove to a nearby Lowe's parking lot to devise a plan for

entering the facility. (Doc. 178 at 79). A few agents were left behind to keep watch over the

building. (*Id.* at 104). After devising the plan, the agents returned to Trail's End at 9:15 pm in

tactical gear to enter the building. (*Id.* at 81). One agent knocked on the door and yelled "police."

(*Id.* at 82). Then, the agents began hitting the door with a battering ram. (*Id.*) After realizing that

the door opened out, not in, the agents used another tool to finally pry the door open. (*Id.* at 83).

After entering the building, Agent Stephen testified that the agents' purpose was to find

any people located in the building, including the two individuals they watched enter the building.

(Doc. 178 at 84). The Mercedes SUV was in front of and slightly to the right of the agents as

they entered. (*Id.*). Agent Stephen testified that both front doors of the SUV were open, and no

people were in the vehicle. (*Id.*). On the left side of the room, an open area leads to the

processing room. (*Id.* at 85). The processing room can also be reached by traveling down a hallway on the right side of the bay. (*Id.*). The two individuals ran toward the back of the building. Once the two individuals inside were detained, the agents vacated the building until they obtained a search warrant. (*Id.* at 122).

While the agents were breaking open the front door, Trooper Harris and at least one other agent approached the building from the rear. (Doc. 178 at 22, 104). Trooper Harris testified that an aluminum tin fence, approximately 10 to 12 feet high and constructed with wood two-by-fours as supports, surrounded the back of the building. (*Id.* at 23, 55–56). A small field was behind the fence. (*Id.* at 23). These agents provided security to the back of the building during the front entry. (*Id.* at 58). Trooper Harris testified that the only way around the fence from the back of the building was over the fence. (*Id.*).

Once the agents entered the front door, Trooper Harris heard loud banging on the aluminum fence. (Doc. 178 at 23). The banging continued, until Mr. Johnson jumped over the fence. (*Id.*). The other agent detained Mr. Johnson while Trooper Harris provided security. (*Id.* at 24).

After obtaining a search warrant, the agents reentered Trail's End. (Doc. 178 at 122). The processing room contained several large galvanized steel tables. (*Id.* at 86). The tables held stacks of U.S. currency and two money counters. (*Id.*). At least one money counter was turned on. (*Id.* at 112). The cash was bundled with rubber bands; the agents counted $455,025 on the table. (*Id.* at 86). The agents also found five cell phones—including one in Mr. Johnson's pocket—throughout the plant and 499 grams of cocaine in bags in a closet. (*Id.*). One phone was found in the processing room hooked up to a charger. (*Id.* at 111). Agents also found in the closet

a suitcase containing more multicolored rubber bands, like the ones used to bundle the cash on the table. (*Id.* at 91).

Agent Stephen testified that the Mercedes SUV had a socket wrench laying in the driver's seat and tools on the ground next to the driver's side. (Doc. 178 at 87). He also saw a pair of work gloves on the floor of the vehicle. (*Id.*). However, Agent Stephen signed off on government reports with no mention of tools on the seat. (*Id.* at 113). The tools on the floor and in the vehicle were not collected or checked for prints. (*Id.*).

Trooper Harris, who also participated in the search once the warrant was obtained, testified that the driver's side door was open. (Doc. 178 at 24). He also testified that a socket with a ratchet on it was lying in the front seat of the car. (*Id.*). He saw more tools on a shelf to the right of the vehicle. (*Id.* at 25).

### b.  Mr. Johnson's account

Mr. Johnson owns a business, Midnight Towing, which tows and transports vehicles. (Doc. 178 at 138). On March 26, 2015, around 2:00 or 3:00 pm, Mr. Johnson received a call from an individual wanting a tow. (*Id.* at 139, 147). When pressed, Mr. Johnson stated that he could not remember the exact time the call came in, but he believed it was before 6:00 pm because it was during the day. (*Id.* at 172–73). He initially testified that he received the call around 2:00 or 3:00 pm until, at the pressure of his counsel, he walked back his guess. (*Id.* at 147–48). The individual who called was a friend of Thomas Having, the owner of Trail's End Deer Processing. (*Id.* at 145).

Mr. Johnson knows Mr. Having through a mutual friend. (Doc. 178 at 140). During the time Mr. Johnson knew Mr. Having, Mr. Having opened a deer processing business. (*Id.*). Mr. Johnson went by to see Mr. Having several times and bought deer meat that people had brought

to be processed but never picked up. (*Id.* at 141). Mr. Johnson kept the deer meat he bought in a freezer in his shop at Midnight Towing until he was able to use it at family gatherings. (*Id.* at 143). Whenever Mr. Having's freezer was full or he had extra meat, Mr. Having would call the people who dropped off the deer to come pick up the meat. (*Id.*). If the people never picked it up before the deadline, Mr. Having would call Mr. Johnson to pick up the meat. (*Id.*). Occasionally, Mr. Johnson would also call to ask if Mr. Having had extra meat. (*Id.*).

At some point, Mr. Having gave Mr. Johnson a key to Trail's End. (Doc. 178 at 144). Mr. Johnson testified that he had the key so he could pick up the meat early if he was available to pick up the meat before Trail's End was open. (*Id.*). Two or three times, Mr. Johnson went early to pick up the meat using his key. (*Id.*). Mr. Johnson was supposed to give the key back to Mr. Having eventually, but Mr. Johnson still had the key on March 26, 2015. (*Id.*).

Mr. Johnson had met the individual who called him on March 26 once or twice before at Trail's End. (Doc. 178 at 145). He was unable to remember the man's name, but said he was a stocky, white guy with short hair. (*Id.* at 145, 171). The man requested a tow of the Mercedes SUV to the deer processing plant. (*Id.* at 146–47). He said that lights were coming on the dashboard, but he was not sure what they meant. (*Id.* at 146). Mr. Johnson called Mr. Having to make sure Mr. Having was ok with Mr. Johnson towing the SUV to the deer processing plant. (*Id.* at 150). Mr. Having approved. (*Id.*). Mr. Johnson told the man on the phone it would cost $65 to tow the car. (*Id.* at 175).

Mr. Johnson was working on his truck at the time of the call, and no other trucks on the lot were available, so he could not tow the SUV immediately. (Doc. 178 at 139–40). When he finished working on his truck around 8:00 pm, he spoke with other men working in their shops on trucks. (*Id.* at 149, 174). Mr. Johnson had no tow trucks available, so he asked the other men

if they could come with him to get this SUV. (*Id.* at 149). Clifton Jordan, a man approximately in his 70s, agreed to go with Mr. Johnson. (*Id.*).

Mr. Johnson and Mr. Jordan found the Mercedes SUV at the LaQuinta and found the key under the front floor mat, where the man who called said it would be. (Doc. 178 at 151). Mr. Johnson turned on the car, and noticed some lights on in the dashboard, but noted they were probably for an airbag or seat belt. (*Id.*).

Mr. Johnson headed for Trail's End with Mr. Jordan following him. (Doc. 178 at 151). Mr. Jordan also knew the way to the deer processing plant. (*Id.*). When Mr. Johnson arrived at the plant, he noted that Mr. Jordan was not right behind him, and guessed he had gotten stuck in traffic. (*Id.*).

Mr. Johnson exited the car, and opened the unlocked front door. (Doc. 178 at 152). He noticed there were tools—including sockets, but no ratchets—on the floor when he went in, so he put them on a shelf before rolling up the door and pulling in the car. (*Id.* at 152–53). He did not notice any other people or cars around the building. (*Id.* at 153). He rolled back down the roll-up door. (*Id.* at 154).

Just after the roll-up door closed, Mr. Jordan pulled up. (Doc. 178 at 154). Mr. Jordan needed to use the restroom, so Mr. Johnson brought him into the building and locked the door behind them. (*Id.* at 155, 177). While waiting for Mr. Jordan to use the restroom, Mr. Johnson heard a phone ringing in the back in the processing room. (*Id.*). Mr. Johnson peeked into the room and saw a large amount of cash stacked on the counter. (*Id.*). The phone stopped ringing. (*Id.* at 156). When Mr. Jordan exited the bathroom, Mr. Johnson showed him the money stacked in the processing room. (*Id.*).

Suddenly, Mr. Johnson heard a loud noise he described as "boom, boom" by the front door. (Doc. 178 at 156–57). Mr. Johnson testified that he believed the sound came from a shotgun. (*Id.* at 156). Mr. Johnson ran away from the sound toward the back door with Mr. Jordan. (*Id.* at 157). After struggling to open the back door for a moment, Mr. Johnson exited out back into a fenced-in area. (*Id.*). He climbed on some barrels to try and jump over the fence. (*Id.*). When he got to the top of the fence, police on the other side told him to get down. (*Id.*). He jumped down from the fence, and they handcuffed him and brought him around to the front of the plant. (*Id.*). Mr. Johnson testified that Mr. Jordan could not get up on the fence, and so police must have arrested him on the other side of the fence by the building. (*Id.* at 158).

After Mr. Johnson was released from jail, Mr. Having came to see him. (Doc. 178 at 160). Mr. Having asked him what he said to the police. (*Id.* at 160–61). Mr. Johnson told him he did not know what was going on. (*Id.* at 161).

Mr. Johnson testified that he did not know cocaine was in the car. (Doc. 178 at 167). He stated that he did not notice anything strange with the car; he did not notice messed up carpet, missing trim, a funny smell, or white powder on the floor. (*Id.* at 167–68).

## II. Standard of Review

Mr. Johnson raises two separate legal issues: whether the court should enter a judgment for acquittal on his behalf under Rule 29 and whether the court should grant him a new trial under Rule 33. Each standard of review will be discussed in turn.

### a. Motion for Judgment of Acquittal

A motion for judgment of acquittal allows the court to determine if the evidence submitted is insufficient to sustain a conviction. *See* Fed. R. Crim. P. 29(a) ("After the government closes its evidence or after the close of all the evidence, the court on the defendant's

motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."). "A district court may overturn the jury's verdict and enter a judgment of acquittal under Rule 29 only 'if there is insufficient evidence to sustain the verdict.'" *United States v. Gilbert*, No. 2:17-cr-00419-AKK-TMP, 2018 WL 5253517, at *1 (N.D. Ala. Oct. 22, 2018) (quoting *United States v. Williams*, 390 F.3d 1319, 1324 (11th Cir. 2004)). And the court must uphold the conviction "unless the jury could not have found the defendant guilty under any reasonable construction of the evidence." *United States v. Frank*, 559 F.3d 1221, 1233 (11th Cir. 2010).

The court must resolve evidentiary disputes in favor of the Government. "In ruling upon a Motion for Judgment of Acquittal, a district court must determine whether the relevant evidence, viewed in a light most favorable to the Government, could be accepted by a jury as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *United States v. Varkonyi*, 611 F.2d 84, 85 (5th Cir. 1980). The court "must accept all reasonable inferences tending to support the Government's case," and must resolve "any conflicts in the evidence" in the Government's favor. *United States v. Taylor*, 972 F.2d 1247, 1250 (11th Cir. 1992). Further, the court "must accept all reasonable inferences and credibility determinations made by the jury." *United States v. Molina*, 443 F.3d 824, 828 (11th Cir. 2006) (quoting *United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir. 1989))

### b. Motion for New Trial

The court may vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33. On a motion for new trial based upon the weight of the evidence, the court "may weigh the evidence and consider the credibility of the witnesses." *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985). Unlike the motion for judgment of acquittal, the

court does not have to view the evidence in the light most favorable to the verdict. *See id.* However, "[t]he evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* at 1313. Courts have "substantial discretion in determining whether to grant such a motion." *United States v. Estrada-Lopez*, 259 F. Supp. 2d 1358, 1371 (M.D. Fla. 2017).

Courts do not favor motions for new trial based upon the weight of the evidence and should grant such motions "sparingly and with caution, doing so only in those really 'exceptional cases.'" *Martinez*, 763 F.2d at 1313 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). In the past, "courts have granted new trial motions based on weight of the evidence only where the credibility of the government's witnesses had been impeached and the government's case had been marked by uncertainties and discrepancies." *Id.*

A new trial based upon newly discovered evidence may be appropriate where the movant presents evidence of juror misconduct or "evidence that would 'afford reasonable grounds to question . . . the integrity of the verdict." *United States v. Scrushy*, 721 F.3d 1288, 1304 (11th Cir. 2013) (quoting *United States v. Williams*, 613 F.2d 573, 757 (5th Cir. 1980)). To justify the granting of a new trial based on newly discovered evidence, the movant must prove four elements:

> (1) the evidence must be newly discovered and have been unknown at the time of trial; (2) the evidence must be material, and not merely cumulative or impeaching; (3) the evidence must be such that it will probably produce an acquittal; and (4) the failure to learn of such evidence must be due to no lack of due diligence on the part of the defendant.

*United States v. Espinosa-Hernandez*, 918 F.2d 911, 931 n.5 (11th Cir. 1990). Similar to motions for new trial based upon the weight of the evidence, "[d]istricts courts . . . should exercise 'great caution' when granting new trials based on newly discovered evidence." *United States v.*

*Sjeklocha*, 843 F.2d 485, 487 (11th Cir. 1988) (quoting *United States v. Johnson*, 713 F.2d 654, 661 (11th Cir. 1983)).

### III. Discussion

Mr. Johnson's two motions are intertwined. "If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d)(1). The court will analyze the Motion for Judgment of Acquittal before turning to the Motion for New Trial.

#### a. Motion for Judgment of Acquittal

The court first considers whether a jury could have found Mr. Johnson guilty under any reasonable construction of the evidence. *See Frank*, 559 F.3d at 1233 ("A conviction must be upheld unless the jury could not have found the defendant guilty under any reasonable construction of the evidence."). Mr. Johnson was charged with two separate crimes, and the jury did not acquit him on either charge.[1] So, the court will analyze separately whether the jury could have found Mr. Johnson guilty of either charge.

Mr. Johnson first moved for a judgment of acquittal at the close of the Government's evidence, upon which the court deferred ruling. "If the court reserves decision [on a motion for judgment of acquittal], it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). So, the court will decide the motion based upon the evidence before it at the close of the Government's case.

---

[1] The jury could not reach a verdict on Count 2. But that failure does not equate to an acquittal. *See United States v. Nimapoo*, No. 1:05-CR-0316-13-BBM, 2008 WL 11384038, at *1 (N.D. Ga. Apr. 11, 2008) (noting that a court applies the same standard for a motion for judgment of acquittal whether the jury convicted the defendant or whether the court declared a mistrial because the jury failed to reach a verdict).

### i. Conspiracy to possess with intent to distribute cocaine

To prove a conspiracy to possess with intent to distribute drugs, the Government must prove beyond a reasonable doubt "(1) an agreement between two or more persons to commit a crime, and (2) the defendant's knowing and voluntary participation in the conspiracy." *United States v. Ohayon*, 483 F.3d 1281, 1292 (11th Cir. 2007).

Here, the jury could reasonably conclude that the Government proved each element beyond reasonable doubt. The jury could have found that Mr. Johnson conspired with at least one other person because he knew what car to pick up and at what hotel he would find that car. Ms. Melgar only told Blue and Pete where the car was parked; either Blue, Pete, or another middleman contacted Mr. Johnson and told him to pick up the car. Mr. Johnson could not know which car to pick up and where to pick it up without communicating with at least one other person.

The jury also could have found that Mr. Johnson was a knowing participant in the conspiracy because he was alone inside the headquarters of a drug operation for several minutes. Mr. Johnson entered Trail's End on his own. Approximately five minutes passed before Mr. Jordan arrived. After he arrived, the two were inside the building for approximately fifteen minutes. Agent Stephen testified trust is "of utmost importance" in a drug enterprise. (Doc. 178 at 97). He pointed out that leaving $455,000 in cash out on the table and cocaine in the building equates to putting one's life savings in cash on one's kitchen table, and telling people working in the yard to go inside while one was out of the house. (*Id.* at 97–98). In other words, "[y]ou wouldn't do it. You don't trust those guys. . . . You're only going to trust family with your livelihood, and that much money . . . ." (*Id.* at 98).

A jury could reasonably infer that no drug dealer would let some random person drive the dealer's car expected to be filled with 14 kilograms of cocaine and go inside the dealer's headquarters with almost $500,000 in cash sitting out in the open. So the jury could reasonably infer that Mr. Johnson must have known of the drug operation and been a part of the conspiracy.

Based upon the evidence the Government submitted, a jury could have reasonably concluded that Mr. Johnson was guilty of conspiring to possess with intent to distribute cocaine because he knew what car to pick up where, drove a car supposedly containing 14 kilograms of cocaine, and was inside a drug operations headquarters for five minutes alone and fifteen minutes with another individual while almost $500,000 in cash lay in the open. Therefore, a judgment of acquittal on this count is inappropriate.

ii.     **Possession with intent to distribute cocaine**

To prove possession with intent to distribute drugs, the Government must prove "(1) knowledge; (2) possession; and (3) intent to distribute." *United States v. Hernandez*, 743 F.3d 812, 814 (11th Cir. 2014) (quoting *United States v. Poole*, 878 F.2d 1389, 1391 (11th Cir. 1989)).

Here, a jury could reasonably find that Mr. Johnson is guilty of possession with intent to distribute cocaine. First, Mr. Johnson possessed the cocaine. He drove the Mercedes SUV containing cocaine—what would have been 14 kilograms of cocaine if the DEA agents had not removed the bulk of the compartment's contents—from the LaQuinta parking lot to Trail's End. While the cocaine was not physically on Mr. Johnson's person, "'[p]ossession' within the meaning of the statute may be either actual or constructive." *Garza v. United States*, 385 F.2d 899, 900 (5th Cir. 1967). Further, "[s]uch possession need not be exclusive, but may be shared with others, and is susceptible of proof by circumstantial as well as direct evidence." *Id.* To

determine whether a person has constructive possession, the court considers whether they had "adequate domination and control" over the drugs. *United States v. Riggins*, 563 F.2d 1264, 1266 (5th Cir. 1977). But "while mere proximity to a controlled substance does not establish possession, control or domination over the vehicle in which the contraband is concealed does support a finding of possession." *Id.*

Here, Johnson was presumably instructed by someone to pick up the car because someone told him where to find the car and its key. Mr. Johnson then drove that car several miles from the parking lot to Trail's End, exercising control and possession of the car in which the cocaine was concealed. So, Mr. Johnson constructively possessed the cocaine when driving the SUV.

The more difficult question is whether Mr. Johnson *knowingly* possessed the cocaine. Mr. Johnson was in Trail's End with the Mercedes SUV and Mr. Jordan for approximately fifteen minutes. When law enforcement agents searched the premises after arresting Mr. Johnson and Mr. Jordan, Agent Stephen and Trooper Harris noted that the driver's door of the SUV was open. They also both noted a socket and ratchet, like those Trooper Harris used to undo the bolts of the seat to access the compartment, in the driver's seat. Agent Stephen testified that tools were lying next to the car and work gloves lying on the floor of the car. Trooper Harris testified that tools were on the shelf next to the car. A jury could infer that, because the driver's door of the car was open and because a socket and ratchet lay in the driver's seat, Mr. Johnson planned to access the aftermarket compartment containing the cocaine underneath the driver's seat. Based on this inference, the jury could reasonably conclude that Mr. Johnson had knowledge of the cocaine in the car.

The government presented circumstantial evidence from which the jury could infer that Mr. Johnson had the intent to distribute. Mr. Johnson drove what was expected to be a large amount of cocaine to Trail's End. The agents found nearly $500,000 in cash bundled on a table. In a closet inside the plant, the agents also found a suitcase filled with rubberbands, like those used to bundle the cash. The agents found two money counters near the cash as well, at least one of which Agent Stephen testified was turned on. Using this evidence together, the jury could have concluded that Mr. Johnson was helping to prepare cocaine for distribution at Trail's End or knew it was distributed from there.

Based upon the evidence submitted by the Government, the jury could have reasonably concluded that Mr. Johnson was guilty of possession with intent to distribute cocaine because he knowingly constructively possessed cocaine with the intent to distribute. The jury could have found Mr. Johnson guilty of possession with intent to distribute cocaine. Even though the jury did not reach a verdict on this count, a judgment of acquittal on this count is inappropriate based on the evidence presented.

Because the jury could have reasonably found Mr. Johnson guilty of both charges, the court will DENY Mr. Johnson's motion for judgment of acquittal.

### b. Motion for New Trial

Within this motion, Mr. Johnson raises four grounds for new trial: (1) the court "committed prejudicial error in failing to rule on Defendant's Motion for Judgment of Acquittal made at the close of the Government's case," (2) the court "committed prejudicial error in failing to rule on Defendant's Motion for Judgment of Acquittal at the close of all the evidence," (3) "[t]he verdict is contrary to the weight of the evidence," and (4) "Defendant has learned that at

least one juror knew the Defendant but did not disclose that to the court during voir dire." (Doc. 167 at 1). The court will discuss each ground separately.

### i.      Failure to rule at the close of the Government's case

Mr. Johnson contends that the court committed prejudicial error by failing to rule on Mr. Johnson's motion for judgment of acquittal at the close of the Government's case. Mr. Johnson initially orally moved for a judgment of acquittal at the conclusion of the Government's evidence. (Doc. 178 at 133). The court withheld ruling on the motion at that time. (*Id.* at 136).

Under Rule 29 of the Federal Rules of Criminal Procedure, the court may reserve ruling on a defendant's motion for acquittal:

> The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.

Fed. R. Crim. P. 29(b). Here, the court was well within the rules to reserve ruling on the motion for acquittal until the jury returned a verdict of guilty.

Rule 29(b) continues: "If the court reserves decision, it must decide the motion on the basis of the evidence *at the time the ruling was reserved*." Fed. R. Crim. P. 29(b) (emphasis added). This part of the rule ensures that the defendant's motion is reserved at the exact time it was made during trial. The court applied this evidentiary standard in the analysis of the motion for judgment of acquittal earlier in this Memorandum Opinion. Therefore, the court did not commit prejudicial error by reserving judgment until the jury had returned a verdict of guilty as to Count 1 and failed to return a verdict as to Count 2.

### ii.      Failure to rule at the close of all evidence

Mr. Johnson also maintains that the court committed prejudicial error by failing to rule on his Motion for Judgment of Acquittal at the close of all evidence. As stated above, Rule 29 of the

Federal Rules of Criminal Procedure states that "[t]he court may reserve decision on the motion . . . submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict." Fed. R. Crim. P. 29(b). As above, because the court was clearly within its discretion under Rule 29 to reserve ruling on the motion for judgment of acquittal until the jury returned a verdict, the court did not commit prejudicial error by failing to rule on the motion at the close of all evidence.

### iii.    Verdict contrary to the weight of the evidence

To determine if the verdict was contrary to the weight of the evidence, the court must ask whether "despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred." *Martinez*, 763 F.2d at 1312. Unlike the legal standard for the motion for judgment of acquittal, the law does not require the court to view all evidence and inferences in the light most favorable to the Government. Instead, the court "may weigh the evidence and consider the credibility of the witnesses." *Id.* But "the district court 'may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'" *United States v. Hernandez*, 433 F.2d 1328, 1336 (11th Cir. 2005) (quoting *Martinez*, 763 F.2d at 1313–14).

The district judge cannot "simply substitute his judgment for that of the jury." *United States v. Cox*, 995 F.2d 1041, 1044 (11th Cir. 1993) (quoting *Conway v. Chem. Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980)). The court's role is to apply law and precedent without the sway of emotions. The court cannot make decisions based on a personal "feeling." *See People ex rel. Union Bag & Paper Corp. v. Gilbert*, 256 N.Y.S. 442, 444 (Sup. Ct. 1932)

("Every litigant is entitled to nothing less than the cold neutrality of an impartial judge who must possess the disinterestedness of a total stranger to the interests of the parties involved in the litigation . . . ."); *see also State v. Cutts*, No. 2008CA000079, 2009 WL 2170687, at *36 (Ohio Ct. App. July 22, 2009) (Hoffman, J., concurring) ("[W]hen I put on the robe as a judge, I must not let my feelings, my emotions . . . influence my review and application of the law."). In the words of Justice Frankfurter, "[t]he judicial process demands that a judge move within the framework of relevant legal rules and the covenanted modes of thought for ascertaining then. He [or she] must think dispassionately and submerge private feeling on every aspect of a case." *Pub. Utils. Comm'n of D.C. v. Pollak*, 343 U.S. 451, 466 (1952) (Frankfurter, J., statement).

Mr. Johnson provides no specific arguments why the verdict was against the weight of the evidence. Nevertheless, the court reviewed all of the evidence to determine whether the evidence preponderates so heavily against the verdict that a serious miscarriage of justice occurred. Motions for new trial only apply to cases that result in a guilty verdict or finding. *See* Fed. R. Crim. P. 33(b) (mentioning that the time to file a motion for new trial begins to run after "the verdict or finding of guilty"). Because the jury returned only one verdict, the court will only analyze whether the jury's guilty verdict on the conspiracy charge was against the weight of the evidence.

The court previously analyzed the Government's evidence in the motion for judgment of acquittal. The court concluded that the Government submitted sufficient evidence for the jury to find Mr. Johnson guilty of conspiracy. In that analysis, the court did not consider Mr. Johnson's evidence and viewed the evidence in the light most favorable to the Government. The court will now also look to Mr. Johnson's testimony and weigh the credibility of all the witnesses.

As explained in the background section previously, Mr. Johnson's and the Government's account of events varied greatly. While the Government purports that Mr. Johnson must have known of the drug conspiracy because he picked up the Mercedes SUV at a hotel, drove it to Trail's End where over $455,000 in cash lay out in the open, and tools to access the drug compartment were found in and around the car, Mr. Johnson maintains that he merely delivered the car as part of his towing business to Trail's End and had no knowledge of the drug operation.

Several inconsistencies between the Government's case and Mr. Johnson's testimony trouble the court. First, Trooper Harris noted that he clearly smelled Bondo in the car. Bondo was used in creating the aftermarket compartment beneath the driver's floorboards. He noted that Bondo has a distinctive smell, and that smell is typically only caused by do-it-yourself mechanics, as more professional services will "bake" Bondo on, which eliminates the smell. Mr. Johnson works on cars; he was working on his truck at the time he answered the call for a tow, and he was familiar with basic mechanical issues with cars as he asked the caller a series of questions to determine what was wrong with the SUV. But Mr. Johnson testified that he never smelled Bondo in the car.

Second, Trooper Harris and Agent Stephen testified that Ms. Melgar called Pete and Blue to identify the hotel where she parked the SUV at 6:37 pm. The driving portion of the drug operation involved Ms. Melgar driving the Mercedes SUV filled with cocaine from Houston to Birmingham and parking the car at a hotel near Birmingham of her choosing. Prior to 6:37, Pete and Blue had no way to know at which hotel Ms. Melgar would leave the car. But Mr. Johnson testified that he got the call to tow the car from the Fultondale LaQuinta during the day, around 2:00 or 3:00 pm. Mr. Johnson did backtrack his estimate on direct examination when his counsel told him not to guess about the time, but was certain he answered the call during the day and

before 6:00 pm. Mr. Johnson could not have gotten the phone call at 2:00 or 3:00 pm because Pete and Blue did not know where the SUV would be until 6:37 pm.

Third, Mr. Johnson testified that the individual called him to request that he *tow* the Mercedes SUV. But Mr. Johnson did not show up with a tow truck. He supposedly waited for a tow truck to pick up the SUV because he was working on his truck. Instead, he arrived at the LaQuinta with a friend's pickup truck. This court doubts an owner of a towing business normally shows up to tow an SUV without a tow truck.

Fourth, Mr. Johnson possessed a key to Trail's End. Mr. Johnson testified that Mr. Having gave him a key to the plant so that he could pick up deer meat when no one else was at the plant, although he said he did not use the key to enter that night. Mr. Johnson testified that Mr. Having (1) introduced Mr. Johnson to the caller, who matches Ms. Melgar's description of Blue, (2) authorized the tow to Trail's End, and (3) called Mr. Johnson after he was released from jail to find out what Mr. Johnson told the police. As Agent Stephen testified, drug operations rely heavily on trust. Why would Mr. Having voluntarily give Mr. Johnson a key to the headquarters of his drug operation? Why would Mr. Having allow Mr. Johnson unrestricted access to the plant? Why would Mr. Having leave nearly $500,000 in cash sitting out in the open—particularly with the front door unlocked—and allow Mr. Johnson to tow the SUV to the plant? The court cannot believe that Mr. Having gave Mr. Johnson a key to Trail's End without Mr. Johnson knowing of the drug operation there.

Fifth, Mr. Johnson drove the Mercedes SUV to Trail's End unsupervised. As Ms. Melgar testified, the heads of this drug operation were protective of their product. Ms. Melgar told agents that earlier in the year, around December 2014, Pete and Blue lost a large amount of cocaine between Houston and Birmingham. On her first trip, before she had fully gained their

trust, Blue and his wife followed Ms. Melgar and closely monitored her driving. But Mr. Johnson drove the SUV alone. While he was followed by the pickup truck, the pickup truck exited off the highway before Mr. Johnson did. Mr. Johnson took a different route and arrived at Trail's End several minutes before the pickup truck. Based upon the amount of trust necessary to drug operations and the intense supervision of Ms. Melgar's first trip, the court finds it unlikely that Pete and Blue would have trusted an individual with no knowledge of the drug operation to pick up and drive the SUV filled with what Pete and Blue expected to be half a million dollars' worth of cocaine without any supervision.

Mr. Johnson was not the only witness whose testimony raised inconsistencies. Both Trooper Harris and Agent Stephen testified that a socket and ratchet lay in the driver's seat of the SUV inside Trail's End. But the law enforcement reports approved by Agent Stephen failed to mention the socket and ratchet at all. The reports also did not mention other tools, which Agent Stephen testified were on the ground by the car and Trooper Harris testified were on a shelf near the car. Trooper Harris's and Agent Stephen's testimonies are quite similar, even with the discrepancy regarding the placement of the other tools. Further, the court believes enough evidence existed beyond the socket and ratchet—including the pickup of the car, the key to Trail's End, and the unsupervised drive—that the weight of the evidence does support the verdict. So, the court must deny the motion for new trial based upon weight of the evidence.

### iv. At least one juror knew Defendant but did not disclose during voir dire

In his motion, Mr. Johnson contends that he learned after the trial that at least one juror knew him, but did not disclose that information to the court during voir dire. (Doc. 167 at 1). Mr. Johnson provides no subsequent information—not which juror knew him, not how Mr. Johnson learned that the juror knew him, and no evidence supporting this allegation.

25

Newly discovered evidence of juror misconduct may give rise to a motion for new trial under Rule 33. *See Scrushy*, 721 F.3d at 1306 (noting that emails from jurors to defense counsel could be, but ultimately were not, new evidence of juror misconduct). To justify a new trial because of newly discovered evidence, the moving party must meet four requirements. First, "the evidence must be newly discovered and have been unknown to the defendant at the time of trial." *Espinosa-Hernandez*, 918 F.2d at 913 n.5. Second, "the evidence must be material, and not merely cumulative or impeaching." *Id.* Third, "the evidence must be such that it will probably produce an acquittal." *Id.* And fourth, "the failure to learn of such evidence must be due to no lack of due diligence on the part of the defendant." *Id.*

Here, Mr. Johnson has not satisfied a single element because he has failed to present even the most basic evidence supporting his argument that a juror knew him and did not disclose that information during voir dire. The court does not know in what capacity the juror knew Mr. Johnson, what evidence exists of the juror's knowledge of Mr. Johnson, how Mr. Johnson became aware that the juror knew him, or even who the juror is.

A bare accusation of juror misconduct does not warrant a new trial. *See United States v. Townsend*, 502 F. App'x 870, 875 (11th Cir. 2012) (denying the defendant's Rule 33 motion based on new evidence of juror misconduct in part because the defendant failed to submit an affidavit from the defense witness whom the juror allegedly spoke with and failed to provide evidence suggesting that the misconduct impacted the jury's verdict). Because Mr. Johnson provided *no* evidence regarding the alleged juror misconduct, the court must deny the motion for new trial based upon newly discovered evidence.

### IV. Conclusion

For the reasons discussed above, the court will DENY Defendant's motion for judgment of acquittal and will DENY Defendant's motion for new trial. The court will enter a separate Order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this 5th day of March, 2019.

_____
**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE